Appellant. Mr. Zucker for the Appellant. Mr. Goodhand for the Appellant. Good morning, counsel. Before we begin today, let me just note that today is Judge Garcia's first sitting as a member of this court, and on behalf of my colleagues, I just wish Judge Garcia a warm welcome to the court and many happy and fulfilling years of service in pursuit of our common calling. Welcome. Congratulations from everybody. Jonathan Zucker and Patricia Toss. I can begin, I think. Jonathan Zucker, Patricia Toss on behalf of the Appellant, request five minutes for rebuttal. I intend to address the jury selection issue and submit on the other issues on the briefs, and that's the only point to argue. And in all candor, I'm inclined to tell the court that Professor Chernoff's articles which were cited are essentially the argument I'm adopting, and the arguments are made much more thoughtfully, persuasively by her in those articles. But the gist of our position on the jury issue is recognizing the difference between a Sixth Amendment guarantee to a jury panel that fairly represents the community, and the Equal Protection Clause analysis. The review in this case is de novo, it's a question of law. The court is well aware the three primary cases relied upon are Duran and Taylor, the Supreme Court cases to deal with jury panel representation, and there's three elements to the claim of this type. The first is that there was, involves a distinctive group that is not fairly represented. Second, that the representation of the group in the panels, and it has nothing to do with the jurors that are actually picked, but that the panels are not fair and reasonable in relation to the makeup of the community, and that the underrepresentation is systemic or systematic exclusion. The first element of, the government doesn't even argue when the court found it dissatisfied. It has to do with black representation of the community within the panels, and I note there was some confusion frankly in the pleadings where it talked about black and Hispanic, but the testimony of both experts only had to do with representation of black members of the community within the panels. The second, whether the representation in the panels, I'm sorry, the second is the statistical difference. Whether that statistical difference between the census, which all the parties agreed was 39.3% black in the last census, and the representation of the panel, which was 24.9%, and I'm talking at this point only about the panel that was sent down for the trial. It was a differential of 14.4%. Subsequent to the trial and subsequent to the initial pleadings, additional expert testimony was taken and reports given, which broadened substantially to include other panels, and in each instance, there was still a difference of discrepancy. There was still a under-representation of black members of the panels compared to members of the community. Can I ask you an element you have not mentioned? Is it an element that the actual jury that sat on your client's case was under-represented? No, I think... Hypothetically, suppose all 12 plus the two alternates were all black. Well, that's... Then how can he claim a denial of the jury of disappearance? The claim is based upon the veneers that are sent down. I know that's your claim. What I'm asking you is what if the panel that actually presided over the trial was at the trial? With all due respect, academically... Was representative. If the panel was all black for the sake of argument, you still have the same issue. For the sake of argument, you sent down a panel of 100 potential jurors, 88 are white, 12... Well, actually, 12 would probably be closer to a representation, but you still have the  same issue. How is that possible? Because that, with all due respect, that's what the law is. As I understand it, the actual jury here consisted of five blacks and seven whites. No, five blacks and, let's see, nine whites. I don't remember the exact numbers, but again, the inquiry based on the precedent is you look at the panel, you look at the representation of the panel... Do you have a case that stands for the proposition that the actual jury that sat on the case is irrelevant? I don't think that's ever been addressed specifically, but I know... I don't think so either, although in Justice White's opinion in, what was it, Duren? I've forgotten the name of it. Duren? Oh, Burguren. He made the point that the jury there was an exclusion of women, and the jury that sat on the case was 12 men. Do you think that was irrelevant for Justice White to mention that? I can't comment on what Justice White chooses to put into his opinion, but I think the standard is it doesn't even matter if the defendant is of the same race that's being questioned. I mean, in Taylor and in Duren, the issue was based on sex discrimination, that the panels did not fairly represent the community because women were being excluded at this point in time. While I have you for the moment, let me ask you another question about your... Why is the census a proper standard by which to measure? Let me tell you why I ask the question. Number one, in the District of Columbia, individuals who are imprisoned don't have a right to sit on a jury. And number two, there is evidence as well, or not evidence, but there are statutes as well, that anybody in the District of Columbia who's been convicted of a felony cannot sit on a jury. So it shouldn't... The census doesn't take into account any of that. I don't know that the census... I assume the census counts people who are convicted felons who would be excluded. I do not know whether or not the census includes incarcerated people. What is the rate of conviction in the District of Columbia of felonies for blacks and whites? I do not know off the top of my head. Suppose it's 50% for blacks, right? I want to make sure I understand your premise. 39% would not be representative at all, would it? You're saying if 50% of the black residents of the District of Columbia were convicted of felonies? Right. That's a pretty amazing statistic. Oh, really? Which would skew... There's a study indicating that that... It's an old study, but it's from 1997 by a prison research group saying exactly that. Well, I still think that the experts in this case chose the census. The court didn't quibble about whether or not the census is the correct parameter to measure the composition of the jury challenge. But I think given the fact that both experts, the ones who were hired by the government and the defense, both chose the census as the representative sample, kind of ends the inquiry for our purposes. And the court accepted it. I don't think that was any factor in the court's decision. Did that answer your question? Sorry? Did that answer your question? No. All right. You want to rephrase it? I mean, you're asking me if... You're making... When you reduce these numbers at 39.4%, et cetera, et cetera, it sounds like you're engaging in a really exact science when in fact you're not. Because we really don't know what the number of eligible individuals in either race are available for jury duty. I will concede that the census does not exclude. I assume the census does not exclude those who are disqualified based on prior convictions. But I think, be that as it may, that's the standard the experts chose to apply. And that's what we have to measure the decision against. And so anyway, I think based on... Well, the first element is already satisfied. It's not even in dispute. The second... Counsel, could I just direct you to the third prong of Duran? So as you know, it requires... Systemic. Knowing that the cause is systemic exclusion, meaning something inherent to the process. And as I understand it, your theory here is that response rates from the black community were depressed because of the pandemic. And what the district court said is those are external factors. And I'm just wondering how we could characterize that as an inherent cause. I would... Whether the pandemic played as large a role as was put forward in the pleadings by trial counsel or the plaintiff's expert. I think we have to look at what the statistics were regardless of the pandemic. But the data is from six to seven months in 2021 during the pandemic. And that's the theory that was put forward in the district court. Well, I agree. But I think if there is under-representation based on either the pandemic or some other reason, we have to look at what the panels were versus what the population is and make a decision. I'm just saying I don't think the pandemic even should play that factor in this case. And I think Judge... And that it wasn't a fluke. So I think we are left with her finding, which I don't challenge, that this wasn't an aberration. This wasn't some... She looked at several... Both experts looked at several panels and said there was under-representation. They quibbled about the numbers and the percentages. But in any event, there was under-representation found. And once that's found, the question of whether or not it's systemic is it's there. Therefore, it's systemic across the panels. I think the bigger issue... The argument you just laid out would reduce this to a two-prong test. The second prong is, is there under-representation? And your approach would be, then the government has to fix it. But I think we need to give some meaningful impact to what the Supreme Court set out as a third prong. And I'm just struggling with how your approach here does that. You know, I think in some ways the second and third prong do mesh. That if there is under-representation, I think we have to infer it's systemic. And the absence of it being systemic is really up to the government to rebut. And I think what they've done here and what has been done by the trial judge and what has been done by numerous circuits is they've looked at this as is there intentional discrimination, which shouldn't be a factor. The factor should be, if the panel does not represent the community, the panel does not represent the community. Absent, you know, trivial distinctions. And the whole... And I guess the point I'm trying to make... What's supposed to happen then? Suppose that we're in a realm in which there is statistical under-representation. What's the jurisdiction supposed to do? Fix it. How? By adopting the measures suggested by Chernoff and, I think, Agores. By using a much more... Requiring the jury office to send follow-up notices. Those have been shown to the people who don't respond. To everybody who doesn't respond? Well, I don't think you could draw a distinction based on race, if that's your question. And then if it just... Suppose that then they're still under-representation. Well... Because why would we think that... Maybe there's something in the literature that answers this. But why would we think that response rates are going to be differential in a meaningful way the second time around versus the first time around? I don't know that they will, but they've been shown to be effective. And so if there's a higher percentage of lack of response among one group, then that is the group that's going to be... There's going to be a higher... You know what I'm trying to say. There's going to be a higher second request that impacts that group more directly. Because there is a lower response rate. And then hopefully that would correct it. Additional measures might be required. It might require the courts taking a more aggressive role. And right now, nothing happens if somebody doesn't respond. And frankly, I was shocked in this case to find out that the response rate on jury summons is really under 40%. And nothing happened. So the question is, if the court does something to enforce people's obligation to serve on juries, or at least to report, I think we could anticipate a more representative response. I mean, the response rate is much lower. I think it's 17% lower among black residents than it is among, I don't know, white or other, however you want to characterize it. So that would be the focus of the second follow-up. And the court has an obligation to comply with the Sixth Amendment right to a jury that is representative of the community. It cannot excuse it saying, well, there's external factors. Those are, frankly, don't comply with it. Those are just excuses and shouldn't be tolerated. The court has an obligation to pursue this. So as long as there's a disparity, then that's, in your view, the end of the inquiry. And the jurisdiction just has to do something about it. That's the way you conceive of the three-prong inquiry. Well, I think if there's a reason for the disparity that is different. I mean, for instance, if the reason for the disparity is along the lines that Judge Randolph intimated, that there's a lot of people who don't respond because they know they're not qualified. I mean, that certainly would be a different explanation. And if that turns out to be the case, you can't correct. But until there's a finding that there is some other reason for this, what is, I suggest, systemic imbalance or difference. Do you know if the notification that goes out lists disqualifying circumstances so that an individual would not have to respond? I could only tell you based on my memory of having getting jury notices because there was nothing in the court record about this. My memory is if you have an excuse, you have to put it in writing and submit it. I've never had to confront that issue as my excuse, but it's more of a scheduling issue. So I don't know the answer to your question. I raise that because I've received jury duty notices from Montgomery County. And I'm sure you've complied. I can disqualify myself because I'm over the age of 65. I just check a box. But I still respond, I guess. Okay, so you'd be included in the response rate. But here we have a response rate that is remarkably low and disproportionately low among one distinctive group. And that's what I suggest the court is obligated to address. Let me make sure my colleagues don't have additional questions for you this time. Thank you. We'll give you some time for rebuttal. Mr. Goodhand. Good morning, Your Honor. May it please the court, David Goodhand for the United States. With me is Counselor David, Deputy Chief John Manarino, and Trial Counsel Mervyn Sedgwick. If I could just address a couple of the questions that were raised to the best of my ability during my opponent's argument. First, as to the question of census versus juror eligibility, there is some debate in the case law about whether or not it's sufficient for a defendant to suggest and reference just census data. Or if there's an additional burden to go further and suggest, no, population is juror eligibility. And I would commend to the court if these are very complex issues. But as I was preparing for oral argument, I came across an authority that goes into great detail about a lot of these issues. And I would commend to the court if you're interested. It's grand jury law in practice by William Bryson and James Fellman. And a very exhaustive review of a lot of the case law and a lot of the debates within this arena. All that said, with respect to the question of census versus juror eligibility as part of the prima facie case, number one, both parties agreed here that we were going to rest with the census data. So we're not suggesting that that was a prima facie part of his burden. Number two, I will note that the Supreme Court has indicated that census data, as long as we're talking about an adult population, obviously over 18, census data can suffice for purposes of the comparison that you're drawing. And I would draw the court's attention to the Duren decision where there is a discussion of the fact that census data was used there. Now, I will say that in Bergeis, I think Justice Ginsburg makes reference to juror eligibility as the relevant benchmark. So even the Supreme Court is a little bit in between, I would suggest, on this question that has been raised. That's the first thing I want to draw the court's attention to. The second thing I want to draw the court's attention to is, you know, I'm looking at the district court's opinion, a very thorough opinion on this topic, but I would just draw the court's attention to JA-277, where she indicated, Chief Judge Howell, and she cites a decision from this court, a defendant need not demonstrate that actual prejudice resulted from the fair cross-section violation at issue. And she cites a 1976 decision, the Vitarello 536F2nd 420. Another question I want to address that came up. The only thing we know, which gets back to the juror eligibility. What does that prejudice in what sense? Are you suggesting that that means the composition of the actual panel, or are you suggesting that that goes to prejudice? I took it to mean, and I apologize, I actually didn't do the deep dive into that case. I took it to mean that you can still bring a fair cross-section claim, even though the actual jury panel may or may not have reflected it. I may be wrong, but that's how I read that sentence, and I apologize. That was in the debate below, and that was something that everybody was kind of on the same page about. In fact, it was only the district court judge who brought out the actual, based on her observations, I think, the actual composition. Do you know if the figures that are being used here apply as well to the superior court? I do not. I know that there is— Do you know if the superior court sends follow-up— I do not know if they—I apologize. I don't know if they use the one-step or the two-step. I can say this on the notion of follow-up. I heard my opponent suggest that that should be a mandatory feature of the system. The other question I have is that the presentation by the defense here is not site-specific, because she's dealing with a global question rather than what actually happened in his own trial. And so, therefore, if we ruled in the defense's favor, it would put in jeopardy, would it not, apart from the question whether an objection was made, it would put in jeopardy every single criminal trial that's gone on for the last, who knows, 10 years in the district. Well, I think the defendant would have had to raise it, and that's sort of part and parcel of the whole jury statute, the selection statute, which is at least on the statutory side of things, and I think the constitutional follows thereafter. You have to raise this. You have to claim either that your indictment was a problematic indictment because of the grand jury, or you have to stay the trial. That is, you have to say to the court, look, I think my petted jury is a product of underrepresentation, and you have to stay the trial, continue the trial until we get this figured out, and you can adjudicate that. So I think those kind of preludes would have to happen before any sort of new trial could be ordered in any case that had unfolded with respect, for example, this master jury wheel or this summons list. That would be my understanding of how that would have to operate. Very briefly, I would point out to the court the suggestion that there must be mandatory follow-up. The court actually addressed this, the district court, that is, at least under the statute, and I'll cite 28 U.S.C. 1864. It gives discretion, may, to the clerk whether or not to summon non-respondents to appear to complete the form, and the district court noted this notion of mandatory enforcement. It actually would violate the statute, number one. Number two, that's sort of like what district court judges have the discretion to haul into court jurors who are summoned, they are on the report list, but they don't actually show up in the courtroom. Well, again, that's discretion for a district court judge. So this notion of mandatory enforcement would violate the statute. Second, it would, I think, you know, we have to step back here and ask what is the right we're talking about. As I understand the right, the fair cross-section right, it is not— Can I just say, when you say it would violate the statute, I'm going to take it if the statute wouldn't be violated across the board or violated at all necessarily because it would only come into play, the notion of follow-up would only come into play in a situation in which you had a disparity. Yeah, I think, yes. So if the Constitution, by appellant's argument, requires the follow-up, then you're not taking the position that the statute forecloses that. No, no, and I think that segues into my next point, which is, as I understand what the Constitution requires, it does not require complete proportionality. What it requires is that the system not cause or create under-representation, and that's the sort of core disagreement we have between the defense and the prosecution here. That is, nothing in this record demonstrates the system created an under-representation. What we have here demonstrated is a non-response rate of persons who get the summons, the questionnaire, and don't return it. That is, I would suggest, and the district court found, a sort of prototypical example of an external force. Those are the decisions of individuals who have gotten the summons slash questionnaire, and they choose, for whatever reason, not to return it. That, every court, as I understand it, and the district court said the same thing, every court has said that non-response is not something that is inherent in the system. The system, thus, did not create any under-representation. Of course, we don't concede that the second prong was met here. Well, on the third prong, is that sort of a categorical position you would stake out, that anything related to response rates is always going to be external, or does it have something to do with the particular facts here? It's hard for me to conjure up, once you're talking about how a person who receives a summons responds to that summons, it's hard for me not to be categorical in suggesting that that is not something inherent in the system. We can, and the district court made this exact same point, we can debate, as a policy matter, what kind of things that a jury office might do, what kind of things a clerk's office might do. A second summons, a follow-up of some sort, but that is not constitutionally required. And I would also note that, at least under the jury selection statute, they expressly best bless, excuse me, the statute blesses this one-step process. So the statute says we're okay with that, and says we're okay with discretion on enforcing the summons. And so the statute seems quite comfortable with the system that's in place here. Can I direct your attention to the Fourth Amendment issue, and in particular, the sufficiency of the 2017 warrant? Sure. It strikes me that, at least on its face, the warrant, both in terms of the scope of the devices that could be seized and the data that could be taken from them, is essentially unlimited. And I'm wondering why, to start with the devices, clearly there was probable cause as to his phone, the computer, and maybe one or two other specific phones. Why shouldn't the warrant have specifically identified those devices, rather than just saying any and all devices that we come across are going to be seized? Well, I disagree with this notion of authorized everything, a seizure of everything, a search of everything. And critically, the warrant, I would suggest, has a global modifier, if you will. The evidence searched for, the paraphernalia, the contraband, the item seized, must be evidence of offense in violation of 22 DC Code 3001. But that limitation doesn't affect which electronic devices they were going to pick up, right? They seized 17 devices when they knew about three or four. Yes, yes. There's not a meaningful limit from the statute as to the devices that they would go in and take out of this home, without regard to who they belonged to or whether they even knew they existed before entering. Well, I think that is a limitation, and I think Griffith speaks to this point. Griffith, of course, very different case. But Griffith, there was no probable cause to believe he even owned a cell phone, no probable cause to believe that he had a phone in his residence, no probable cause to believe that the phone contained any evidence of a crime. All that is different from what we have here. But what Griffith said is if you can establish a nexus, and Griffith said if you can establish a nexus between the crime and the phone and then devices linked to the shooting was the phrase that Griffith used, and that's at page 1276, that would be permissible. And Griffith talked about one way that when you link a statute to a device is by officers, for example, could have examined the device initially thought might belong to Griffith, but they could not have seized the device until they became aware it belonged to his girlfriend. So that's one limitation here is if you go in and you figure out that the phone or the computer doesn't belong to the defendant, then you don't seize it. But getting back to the whole question of the phones that were seized, there were a number of phones that were seized, for sure. But that, I would suggest, was a natural consequence of the facts of this case. That is, here we had a year-long allegation of ongoing sexual abuse. Integral to that criminal conduct were the phones, at a minimum two phones, the complaining witness's phone and the defendant's phone. So already we're talking about multiple phones. Added to that are further reasonable inferences, I would suggest. And again, we're talking about probable cause. But the further reasonable inferences are these. Even a citizen who isn't committing sexual abuse cycles through a phone. You upgrade them, you lose them, you change phones.  Who is engaging in ongoing, regular sexual abuse of a minor. That person, I would suggest, it's a reasonable inference to conclude, might well cycle through phones a little faster. And may spread out his indicia of guilt over a number of phones. I would suggest that an officer drafting this warrant would be remiss in the case of a year-long sexual conduct criminal offense, to focus in on one phone. Can I just ask on that score? Sure. As I recall, the suggestion was made that it could be cabined to two iPhones because the victim had identified two iPhones. And I don't remember exactly what her age was at the time that she had the exchange, but she was still pretty young. Yeah, I believe 14. 14 at that time. So it's at least, you'd have to rely on a 14-year-old's recollection of the particular type of phone. And am I right that there were iPhones that were mentioned, but then it was a Motorola phone that had... Right. Do you know what happened? Why was it not an iPhone? Why was it a Motorola phone that ends up with the bulk of the... I have no idea. I don't think the record speaks to that. I think, if anything, it speaks to the inferences that I was just alluding to. Right. That's what I'm wondering is... I don't think the record speaks to it. It speaks to what kind of common-sense conclusions we can draw based on the activities of a computer-savvy, a cell-phone-savvy criminal defendant. Yeah, I certainly appreciate those arguments as to the devices. I wondered if you might just very briefly address the scope of the data seized as well. And maybe the quickest way to get at that is, you did draft this 2019 warrant that set out specific categories. The 2017 warrant doesn't have any limitation. And I think we can all imagine categories of information that might be on a cell-phone, banking information, health information, that wouldn't really have a plausible connection to a crime like this. Again, I disagree with the notion that there was no limitation with relation to the electronic data. Again, I circle back to the global modifier. The data that was seized had to relate to the specific offense of first-degree child sexual abuse. Now, when you seize that phone, you have no idea, as an officer, where on that phone the data is going to be. You know, Bass is a case where they talk about, we know, and it's fair to infer, that manipulation of files, deletion of files, counterfeiting of files. So when an officer seizes a phone, and I would point to the 7th Circuit's decision in Bishop, it goes into great detail about, you know, if you link it to a statute, you can go through every file. And I would encourage the court to look at the Bishop decision, excuse me, that Chief Judge Howe relied on quite heavily in her decision. You say we don't have to decide any of this. I'm saying that... Because of Leon. Oh, well, sure. Yeah, the good-faith exception, we would suggest, is a backup argument for us. If it's easier for this court to go down... It doesn't have to be a backup. It could be the... It could be the primary argument. And on that point, you know, I see my time's out. I will make one final point. Griffith did not find that the Leon exception had been met. Griffith, however, went to great pains to emphasize that there were two features of that case that were different, that were outcome-determinant. Number one, the missing probable cause, and number two, the overbreath. Here, missing from the equation is the absence of probable cause. District Court found probable cause. My opponent hasn't challenged that ruling on appeal, and I understand why my opponent has not. The probable cause supported seizure of the phones, the seizure of the computers, and the electronic data, all of which was the global modifier relating to the specific offense of first-degree child sexual abuse. Can I just ask one practical question? So the warrant describes the suspected evidence as consisting of a bunch of devices, and then it has the clause that you've been relying on, which is evidence of an offense in violation of D.C. Code 22-3008. Is it the case that when law enforcement officers are executing a warrant framed in that way that they understand that which is clause as cabining, the stuff that comes before that, what they're looking for is information that's evidence of an offense in violation of D.C. Code, so that if they see something on the device that self-evidently has nothing to do with that, that that's not going to be searched? That's 100% my understanding. And it's not just, I would suggest, individual to law enforcement. I would suggest that's common-sense reading of that paragraph. That is, these are items that we believe we have probable cause to conclude are on the premises. You can only seize those items and look at that electronic evidence if it is evidence of an offense in violation of first-degree child sexual abuse. Right, but it doesn't necessarily follow that the search would have to be cabined. Oh. Because it already says that the device is evidence. Sure, sure. So then you'd have to carry that through to say, and that's also cabining the way that I'm looking at the device. That's how I read it, and I would suggest that's a common-sense reading. Again, it's that conditioning global modifier that applies to everything that we see, the devices and the data. Unless there are any further questions, we would ask that the Court affirm the judgment and conviction. Thank you. Thank you, Mr. Goodhand. Mr. Zucker, we'll give you back three minutes for rebuttal. My colleague called my attention. I said, Judge Huvero. I meant to say Judge Howell. I was a trial judge. I just misspoke. Regarding the probable cause in this case was for the two phones that were mentioned by the complainant, and everything was seized. So I would suggest the warrant simply went beyond or the seizure went beyond, and to say that Leon establishes a good-faith reliance when the executing officers knew that only two phones were mentioned is to create an exception that swallows the rule. The only thing I would point to, frankly, regarding opening up the lion's gate or the flood doors of every case that's been tried, I think to the same challenge, I have to agree with Mr. Goodhand that those doors have been closed because no other cases that I'm aware of have raised or preserved this issue. And frankly, I don't know that current panels have the same infirmity. Nobody's looked at it as far as I know. In which case, they may raise prospectively this same issue, but in my opinion, that would be a good thing because it would put pressure upon the jury office to correct what I suggest is this error, which is a Sixth Amendment violation. You've been in the criminal defense business for quite some time, and I don't expect you to know this, but a memory is triggered by this discussion. I think there was a movement in the District of Columbia federal court to expand the jury pool beyond the geographic confines of D.C. into the suburbs of Maryland and Virginia. Does that ring a bell? No. You've got a couple of years on the judge, but no, it doesn't. The reason for it, as I recall, was that they were running out of eligible jurors because people kept getting called and called and called again. But I don't know whatever happened to it, and I don't know whether there were any congressional hearings. Are you aware of any? No, and it doesn't even ring a distant bell in all candor. I am familiar with what you've said, that when we were in the 90s going through juries left and right, that there was a resentment within the community about how often people were being called to serve. I do recall that distinctly, but I don't recall anything about, let's go get jurors from Maryland or Virginia to address it, and I don't know what that would raise. Is there anything else the court wants me to respond to? I mean, I guess the bottom line I'm focusing on here is we cannot excuse the failure to comply with the Sixth Amendment requirement by looking at intent, which is really non-applicable. It's applicable in an equal protection context. It's not applicable in a Sixth Amendment context, and my recollection is Durand supports that, says we don't look at intent. We look at what the results are. Okay. Thank you, counsel. Thank you to both counsel. Mr. Zucker, you are appointed by the court to represent the appellant in this matter, and the court thanks you for your assistance. We'll take this case under submission.
judges: Srinivasan, Garcia, Randolph